UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN THE MATTER OF | CASE NUMBER |
| **Robert Milton Rollins** | **06-10549**<br>**Section "A"** |
| DEBTOR | CHAPTER 7 |
| **Edward W. Kleppinger**<br>**Wilhelmina L. Kleppinger**<br>Plaintiffs | ADVERSARY NUMBER |
| | **06-1291** |
| versus | |
| **Robert Milton Rollins**<br>Defendant | |

**MEMORANDUM OPINION**

Robert Milton Rollins ("Debtor") filed a petition for relief under Chapter 7 of the Bankruptcy Code on June 16, 2006, and received a discharge on September 27, 2006. Edward W. and Wilhelmina L. Kleppinger (collectively the "Kleppingers") filed a Complaint for Determination Excepting Debt from Dischargeability ("Complaint") on September 11, 2006. On May 3, 2007, the Court conducted a trial on the merits. Entering appearances at the trial were:

Robert William Knights

Counsel for Plaintiffs, Edward W. Kleppinger and Wilhelmina L. Kleppinger

Claude C. Lightfoot, Jr.

Counsel for Defendant, Robert Milton Rollins

At the conclusion of the trial, the parties were given leave to submit post-trial briefs on or before May 25, 2007, after which the Court took the matter under advisement. The Court having considered the pleadings, evidence presented, and arguments of counsel, issues the following

Memorandum Opinion.

**Jurisdiction**

This Court has jurisdiction pursuant to 28 U.S.C. §§157 and 1334; and 11 U.S.C. §523(a)(2).

**Facts**

The Complaint alleges that Debtor improperly withdrew and used funds held in a joint venture bank account and that he misled the Kleppingers by misrepresenting his assets and his intent to repay them.

Debtor is a New Orleans based real estate agent, appraiser, and rental manager. The Kleppingers are former business partners and friends of the Debtor. Debtor first met the Kleppingers in1985 when he assisted them with the purchase of several rental properties.[1] Debtor also managed the rental properties for the Kleppingers; finding tenants, collecting rents, and supervising the properties' upkeep.[2]

In 1993 the Kleppingers lent Debtor money to purchase his own investment property. Debtor renovated the property and sold it for a profit after repaying the Kleppingers' loan with interest.[3] After the Kleppingers witnessed Debtor's success with this initial project, the parties formed a joint venture. Debtor's responsibility was to find suitable properties to rehabilitate, hire contractors to perform the renovations, supervise the renovation work, and market the properties for sale or rental after the renovations were complete.[4] The Kleppingers provided the funds to purchase and renovate

---

[1] Trial Transcript (:T.Tr.") 21:22-22:7.

[2] T.Tr. 22:18-21; 23:13-24:8.

[3] Tr.T. 22:24-23:12.

[4] Tr.T. 33:16-24.

2

the properties.[5]

A construction bank account was maintained by the joint venture for the purpose of satisfying renovation costs. Both Debtor and Edward Kleppinger ("Kleppinger") had signature authority on the account, although Debtor was the party who primarily used the account since he was responsible for construction management.[6] Kleppinger was given the monthly bank statements and canceled checks and routinely reconciled the account.[7] He also maintained a computer software ledger for each project to track costs of construction and the amounts he had advanced.[8]

When a property was sold, the Kleppingers were repaid the costs of acquisition and renovation without interest. Any remaining profit or loss was split evenly between the Kleppingers and Debtor. If there was a profit, Debtor would receive a check at closing. If there was a loss, Debtor's portion of the loss was carried by the joint venture until it could be offset by future joint venture profits.[9]

A second bank account was held by the joint venture for the purpose of managing rental properties owned by the joint venture. All rents were deposited into the management account and the expenses associated with ownership, *i.e.* maintenance, real estate taxes, insurance, etc., were paid from this account.[10] Again, both Kleppinger and Debtor had signature authority and Kleppinger regularly received the bank statements and canceled checks on the account. As with the construction

---

[5] Tr.T. 34:24-35:5.

[6] Tr.T. 35:6-11.

[7] Tr.T. 35:12-19; 58:12-59:19.

[8] Tr.T. 61:16-62:3; 143:1-144:21.

[9] Tr.T. 36:21-37:17.

[10] Tr.T 24:10-13.

3

account, Kleppinger reconciled the statements to the checkbook and classified all disbursements and deposits by property in a computer ledger.

While the parties were in business together, Debtor never appears to have had much in the way of financial means.  Debtor often needed assistance from the Klepplingers with living expenses and living arrangements.[11]  The Klepplingers routinely advanced Debtor small loans to tide him over until a joint venture project could be completed and sold.  The advances, made from the joint venture's accounts,  were categorized as loans and repaid from Debtor's share of joint venture profits.  At first, Debtor would ask Kleppinger for permission before taking an advance, but eventually Kleppinger gave Debtor permission to borrow small amounts of money without discussing it with him provided he marked the checks "RR Loan."[12]  From 2001 through Spring of 2004, Kleppinger advanced approximately $97,750.00[13] to Debtor without complaint.  Kleppinger also received periodic repayments from Debtor.  As of Spring 2004, the outstanding balance for Debtor's personal advances was $45,427.30.[14]

---

[11] Tr.T 142:10-14; 151:15-23.

[12]  Tr.T 74:13-75:4; 94:21-23; 142:10-25.

[13]  Exh. 1.  Kleppinger testified that he credited Debtor's account for an additional $40,000 on the sale of a joint venture project located on Dauphine Street.  That credit is not reflected on Exh. 1 but satisfied the amounts Kleppinger claims Debtor owed for his share of losses associated with the joint venture's projects.  The remaining balance represents personal loans made by Kleppinger to Debtor over the period.

[14]  Exh. 1.  The amounts include sums advanced and unpaid through April, 2004.  After January of 2004 all advances to Debtor appear to be related to Spain Street, including mortgage payments on the property.

4

The problems between Debtor and the Kleppingers have their genesis in Debtor's decision to purchase, for his own account, a property located at 530 Spain Street, New Orleans, Louisiana.[15] Debtor obtained a mortgage loan to purchase the property and a separate construction loan to fund its renovation.[16] Unfortunately, the cost to renovate the property was higher than Debtor anticipated due to problems with a contractor.  In late Spring of 2003, Debtor had a partially renovated house with no funds to complete the project.[17]  Kleppinger volunteered to help by loaning Debtor funds to complete the renovation.[18]

By the Spring of 2004, Debtor had borrowed an additional $92,373.54 for his Spain Street project[19] and the renovations were still not complete. Although Kleppinger kept a running balance of the sums Debtor owed both for personal advances and on the Spain Street project, until the Spring of 2004, he did not object to either Debtor's personal borrowings or his borrowings for Spain Street.[20]  In fact, there was no evidence that Kleppinger ever discussed with Debtor a need to begin repaying the outstanding  amounts.

The relationship between Debtor and the Kleppingers collapsed in the Spring of 2004 when Kleppinger was preparing his 2003 taxes and realized how much money Debtor had borrowed.[21]

---

[15]  Unless noted, all property referenced in this Opinion is located in New Orleans, Louisiana.

[16]  Tr.T. 145:20-146:17; 147:21-148:11.

[17]  Tr.T. 146:25-147:16.

[18]  Tr.T. 148:22-149:10.

[19]  Exh.1.  The amounts include sums advanced through April, 2004.

[20]  Tr.T. 83:7-14; Exh.1.

[21]  Tr.T. 40:7-13.

Kleppinger confronted Debtor and demanded that the borrowing stop.  He also abruptly ended their joint venture.[22]  In order to calm an angry Kleppinger, Debtor represented that once Spain Street was complete, the equity created, when combined with the equity in a second property owned by Debtor and located in Alabama, would be sufficient to satisfy the amounts presently outstanding.

Somewhat appeased, Kleppinger agreed to forbear from collection but insisted that all borrowing stop.  He took control of the construction account which he closed shortly thereafter.  He also stopped depositing funds into the rental account in an effort to control Debtor's access to funds. Nevertheless, Kleppinger continued to voluntarily pay the expenses to complete the Spain project, even funding mortgage payments on the property to avoid defaults on the loans that primed his interest.[23]

As the Spain Street project neared completion, in March of 2005, Kleppinger again confronted Debtor regarding his outstanding debt; demanding that Debtor sign an agreement setting forth the terms of the parties' business relationship and the basis for the debts owed by Debtor to the Kleppingers.[24] On March 10, 2005, the parties signed an agreement which  memorialized the terms of their obligations to each other ("Agreement").[25]  The Agreement stated that Debtor owed the Kleppingers $180,426.27.  In addition to an acknowledgment of the amounts owed, Debtor "pledged

---

[22]  Tr.T. 40:22-41:1.

[23]  Exh. 1; Tr.T. 62:22-24; 66:14-67:3.  After April 2004, the Kleppingers advanced $50,135.56 funded to complete the Spain Street project.  The funds were paid by the Kleppingers from the construction account, their personal and business bank accounts and the rental account. Of the amounts lent, $27,300 paid the superior mortgage debt on the property.  One credit of $27,076.11 was received when Spain Street was sold.

[24]  Tr.T. 15:19-16:7.

[25]  Exh. 1.

6

all of his assets to secure the funds Ed and Willi were expending on his behalf."[26]

Shortly before Debtor signed the Agreement, he transferred his interest in three pieces of property, 2465 Burgundy Street, 2763 Jasmine Street, and 128 King Charles Way, Alabaster, Alabama (the "Alabama property") to his sister.[27]  The stated consideration for the Burgundy and Jasmine transfers was the assumption of debt against the properties.[28]  Debtor's sister paid "ten dollars and other valuable consideration" for the Alabama property.[29]  At the time of the transfer, the property was subject to a mortgage in the approximate amount of $138,000 and remained subject to that mortgage following the sale.[30]

Despite the execution of the Agreement, Kleppinger continued efforts to collect his debt. Within days of the Agreement, Kleppinger began making angry calls to Debtor and pounding on his home door demanding repayment.  Within sixty days, the Kleppingers sought the advice of legal counsel regarding collection.  Shortly thereafter, the Kleppingers discovered Debtor's transfer of the Burgundy, Jasmine, and Alabama properties and filed a suit in the Civil District Court for the Parish of Orleans.

---

[26] Exh. 1, ¶ 6.  The Agreement was signed by Edward Kleppinger and Debtor.  Debtor disputes that he signed the Agreement, although he admitted that his signature appears on the Agreement and further admitted that his signature would be difficult to duplicate.  He was unable to give any explanation for why his signature would appear on the Agreement if he did not, in fact, sign it.  The Court does not find Debtor's testimony on this point to be credible.

[27] Exh. 2 - 4.

[28] Exh. 2 & 3.

[29] Exh. 4.

[30] Debtor's Statement of Financial Affairs, docket no. 1, and Amended Statement of Financial Affairs, docket no. 26.

Debtor filed the above captioned bankruptcy on June 16, 2006, and the Kleppingers subsequently instituted the above-captioned adversary to object to the dischargability of their debt. The Kleppingers assert that their debt is excepted from Debtor's discharge under section 523(a)(2)(A).[31]

## Law and Analysis

Section 523(a)(2)(A) excepts from discharge money, an extension, renewal, or refinancing of credit to the extent obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's . . . financial condition."[32]  A creditor must prove his claim is not subject to discharge by a preponderance of the evidence.[33]

There has been much judicial discussion regarding the elements necessary to establish that a claim is non-dischargeable under section 523(a)(2)(A).  Historically, courts distinguished between a claim created by false pretense or representation as opposed to actual fraud.  False representations or false pretenses were defined as statements that falsely depicted current or past facts.[34]  On the other hand, actual fraud was recognized when a debtor made a promise regarding future action

---

[31] Debtor's brief also mentioned § 523(a)(2)(B), however, the Kleppingers state that they do not specifically rely upon that subsection because only the Agreement was written. Furthermore, the Agreement does not satisfy the requirement that it is respecting a debtor's financial condition.  *See, In re Flaherty*, 335 B.R. 481, 490 (Bankr. D.Mass. 2005) (noting that, to fall under § 523(a)(2)(B), the financial statement must be "one that specifically states a debtor's or insider's net worth.").

[32] 11 U.S.C. § 523(a)(2)(A).

[33] Preponderance of the evidence has been defined as "the greater weight of evidence.  It is the evidence which, when weighed with that opposed to it, has more convincing force and is probably more true and accurate."  *Smith v. U.S.*, 726 F.2d 428, 430 (8th Cir. 1984).  *See also, Grogan v. Garner*, 498 U.S. 279, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991)(establishing preponderance of the evidence burden for objection to discharge).

[34] *RecoverEdge, L.P. v Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995).

which at the time, he had no intention of fulfilling.[35]

Depending on the type of representation, false pretense or representation versus actual fraud, the elements of proof changed. If a false pretense or representation was alleged, the creditor was required to show that the misrepresentation was (1) knowingly made by the debtor; (2) described a past or current fact; and (3) was relied upon by the other party.[36]

In contrast, actual fraud required a creditor to show that (1) the debtor made a representation as to a future action; (2) that debtor had no intention of fulfilling; (3) made with the intent to deceive the creditor; (4) the creditor relied on the representation; and (5) the creditor sustained losses as a proximate result of the representation.[37]

In 1995, the United States Supreme Court decided *Field v Mans*.[38] *Mans* addressed the level of reliance a creditor needed to show in order to exempt a debt from discharge under section 523(a)(2)(A). In its holding the Court provided:

> The operative terms in §523(a)(2)(A), on the other hand, "false pretenses, a false representation, or actual fraud," carry the acquired meaning of terms of art. They are common-law terms, and, as we will shortly see in the case of "actual fraud," which concerns us here, they imply elements that the common law has defined them to include. . . .
>
> It is ... well established that '[w]here Congress uses terms that have accumulated settled meaning under...the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.'"

---

[35] *Matter of Bercier*, 934 F.2d 689, 692 (5th Cir. 1991), *quoting*, *In re Roeder*, 61 B.R. 179, 181 (Bankr. W.D.Ky. 1986).

[36] *RecoverEdge, L.P. v Pentecost*, 44 F.3d 1284 , 1293 (5th Cir. 1995); *In the Matter of Allison*, 960 F.2d 481 (5th Cir. 1992); *In re Allison*, 960 F.2d 481, 483 (5th Cir. 1992); and *In re Ledet*, 2000 WL 278092 at * 4 (E.D. La. 2000).

[37] *In re Bercier*, 934 F.2d at 692.

[38] 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

       *          *         *

Then, as now, the most widely accepted distillation of the common law of torts was the Restatement (Second) of Torts (1976),...[39]

The *Mans* Court held that the terms in §523(a)(2)(A) incorporated the general common law of torts, the dominant consensus of common-law jurisdictions rather than the law of any particular State.[40]  After review of the Restatement, the *Mans* Court applied the elements established in the common law to the proof offered by the creditor.

The Restatement (Second) of Torts[41] defines a fraudulent misrepresentation as a deceit. When one makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action, a deceit has occurred.  The perpetrator is liable to the other for pecuniary losses caused as a result of justifiable reliance upon the misrepresentation.[42] The Restatement does not distinguish between false pretenses, representations, or actual fraud.  Instead, all are included in the general definition of a fraudulent misrepresentation.  For example, the Restatement provides that "a representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention."[43]  Thus, a fraudulent misrepresentation may be both as to past facts and future actions.

---

[39] *Field v. Mans*, 516 U.S. 59, 69, 116 S.Ct. 437, 443, 133 L.Ed.2d 351 (1995)(citations omitted)

[40]  *See, Field v. Mans*, 513 U.S. 59, 71, 116 S.Ct. 437, 444 n.9.

[41] (1976), hereinafter "Restatement."

[42]  Restatement § 525.

[43]  Restatement § 530.

The *Mans* decision has caused some courts to question the propriety of requiring different elements to establish false misrepresentations versus actual fraud.[44]  Other courts maintain that the distinctions remain valid.[45]   In 2005, the United States Court of Appeals for the Fifth Circuit summarily answered the question, at least for cases pending in the Fifth Circuit.   In a case involving an alleged false misrepresentation, the Court concluded that the creditor must show:

> (1) that the debtor made a representation; (2) that the debtor knew the representation was false; (3) that the representation was made with the intent to deceive the creditor; (4) that the creditor actually and justifiably relied on the representation; and (5) that the creditor sustained a loss as a proximate result of its reliance.[46]

The combined effect of the *Acosta* and *Mans* decisions is to create uniformity in the elements of proof necessary to establish an exception to discharge under §523(a)(2)(A), whether through false pretense, false representation, or actual fraud.   Therefore, in order for the Kleppingers to prevail, they must prove:

> (1) that the debtor obtained an extension of credit; as a result of
> (2) a false representation;
> (3) made by the debtor with the intent to deceive the creditor;
> (4) that the creditor justifiably relied upon; and

---

[44]  *See, In re Merrick*, 347 B.R. 182 (Bankr. M.D.La. 2006) and *In re Melancon*, 223 B.R. 300 (Bankr. M.D.La.1998).  *See also, Palmacci v Umpierrez*, 121 F.3d 781 (1st Cir. 1997); *In re Rembert*, 141 F.3d 277 (6th Cir. 1998); *In re Kirsh*, 973 F.2d 1454 (9th Cir. 1992); *In re Young*, 91 F.3d 1367 (10th Cir. 1996); and *In re Johannessen*, 76 F.3d 347 (11th Cir. 1996).

[45]  *See, In re Catalanotto*, 2007 WL 1111681 (Bankr. E.D.La. 2007); *In re Jacobson*, 2006 WL 2796672 (W.D. Tex. 2006); *In re Quinlivan*, 347 B.R. 811 (Bankr. E.D. La. 2006); *In re Kilroy*, 357 B.R. 411 (Bankr. S.D.Tex. 2006) and *In re Ledet*, 2000 WL 278092 (E.D.La. 2000).

[46]  *In re Acosta*, 406 F.3d 367, 372 (5th Cir. 2005).  In *Acosta*, an individual guarantor/ officer of the borrower was alleged to have represented that debtor's ship was free and clear of all encumbrances.  A loan was made, secured by a first preferred ship mortgage on the vessel. When it was discovered that a priming ship mortgage already existed against the vessel, the creditor sued the guarantor and alleged the debt was excepted from discharge under § 523(a)(2)(A).

(5) sustained a loss as a proximate result of its reliance.

The Kleppingers maintain that they were induced to extend Debtor credit and refrain from collection through the use of false representations and actual fraud.  Specifically, the Kleppingers allege that Debtor represented that the Spain Street and Alabama properties would be available to sufficient to satisfy their debt, which was a false representation.  They further allege that Debtor agreed to satisfy their debt from the pledge of his assets and instead transferred assets, including the Alabama property, to his sister.  The Kleppingers allege that the removal of property from Debtor's estate constitutes a fraud.

Debtor and Kleppinger, by all accounts, had a successful business and personal relationship for many years.  That relationship included the Kleppingers' advance of small amounts for Debtor's personal living expenses.  The amounts lent for this purpose and still outstanding were incurred as early as 2001 and prior to April 2004, before the Kleppingers complain that Debtor misrepresented his intentions to them.  Beginning in 2003, the Kleppingers also advanced funds for the renovation of Spain Street.  These advances also predate any alleged false representation or fraud asserted by the Kleppingers.

Kleppinger was fully aware that the amounts were being borrowed as he contemporaneously maintained a computer ledger of the amounts advanced.  Despite his allegations that Debtor improperly withdrew funds from the joint venture's accounts, he offered no evidence that prior to 2004, he voiced any complaint regarding Debtor's practices.  Therefore, the Court finds that Debtor did not initially obtain credit from the Kleppingers through fraud, false pretenses or false representations as the initial loans were not obtained through the Kleppingers' reliance on a false representation or actual fraud.

12

In April of 2004, Kleppinger became aggravated over the extent of Debtor's borrowings and confronted Debtor. At the time, Debtor owed $137,800.84; consisting of $45,427.30 in personal loans and $92,373.54 in advances associated with Spain Street's renovation. During that confrontation, Debtor promised to pay the Kleppingers back and assured Kleppinger that the equity existing in the Alabama and Spain Street properties would satisfy the existing indebtedness.[47] Specifically, Debtor represented that after renovations were complete, Spain Street would have a market value of $60,000 over and above the mortgage debt it secured.[48] He also expressed a belief that the Alabama property had an equity cushion of $80,000.[49] The combination, $140,000, was sufficient to satisfy the sums due to the Kleppingers. Thus, in 2004, Debtor made two representations to the Kleppingers in order to induce them to forbear from collection. The first representation was as to the value of the Spain Street and Alabama properties and the second was that they would be available to satisfy the Kleppinger loan.

There is no doubt that the Debtor's representations as to Spain Street and the Alabama properties resulted in a forbearance from collection by Kleppinger.[50] Kleppinger made a demand for payment and Debtor offered the liquidation of Spain Street and the Alabama property as a means of satisfying the outstanding debt. Section 523(a)(2)(A) requires that the Debtor make a false or fraudulent representation to the creditor in an effort to induce the extension or renewal of credit that the creditor justifiably relied upon in making his decision. Statements made in an effort to obtain a forbearance from collection or an extension of time to repay fall within the parameters of the

---

[47] Tr.T. 41:2-8; 47:7-19; 48:4-11.

[48] Tr.T. 48:25-49:4.

[49] Tr.T. 48:4-11.

[50] Tr.T. 49:5-15; Exh. 1.

statute.[51] An extension, within the meaning of §523(a)(2)(A), is "an indulgence by a creditor giving his debtor further time to pay an existing debt."[52] The Bankruptcy Code protects a creditor "who is deceived into forbearing from collection without being given an opportunity to grant or deny the extension of credit."[53] The Court is convinced that Debtor's statements regarding the availability of the Spain Street and Alabama properties to repay the existing debt were a material factor in the Kleppingers' decision to forbear from collection. Given the relationship between the parties and Debtor's particular expertise in valuing property, the Kleppingers were justified in relying on Debtor's statements.[54] The question remains, however, were the statements false?

Despite Debtor's belief that upon Spain Street's completion and sale, $60,000 in equity could be liquidated, it produced only $27,076.11 in net proceeds to the Kleppingers. While the Kleppingers alleged that Debtor misrepresented the value of Spain Street and the Alabama properties, the Kleppingers offered no proof to establish this fact. The Kleppingers instead rely on Debtor's expertise as an appraiser to establish that he must have known that Spain Street was not worth what he represented it to be.

The record reflects that the Debtor's ability to forecast property values after renovation is somewhat questionable and this was a fact known to the Kleppingers. The Kleppingers and Debtor purchased and renovated eleven properties over an eleven year period. While the Kleppingers relied

---

[51]    *In re Plechaty*, 213 B.R. 119 (6th Cir. 1997); *In re Gerlach*, 897 F.2d 1048 (10th Cir. 1990).

[52]    *In re Gerlach, 897 F.2d at 1050; In re Fields*, 44 B.R. 322, 329 (Bankr. S.D. Fla. 1984), *both quoting, State v Mestayer*, 144 La. 601, 80 So. 891, 892 (1919).

[53]    *Id.*

[54]    *See, e.g, Matter of Harasymiw* 895 F.2d 1170, 1173 (7th Cir. 1990); *Sanford Institution for Savings v. Gallo*, 156 F.3d 71, 76 (1st Cir. 1998); *In re Braizblot*, 194 B.R. 14, 22 (Bankr. E.D.N.Y. 1996); *In re Spar*, 176 B.R. 321, 328 (Bankr. S.D.N.Y. 1994).

14

upon Debtor's real estate appraisal expertise, that reliance was less than fruitful. During the existence of the joint venture many of the renovated properties were sold at a loss. When the joint venture ended, Kleppinger admitted that the collective result of eleven years of investing was to merely break even.[55] "[A]n honest belief, even if unreasonable, that a representation is true and that the speaker has information to justify it does not amount to an intent to deceive."[56] Thus the Court finds that Debtor's representations with regard to the value of the Spain Street and Alabama properties were not knowingly false.

With regard to the Alabama property, the Kleppingers claim that the availability of the Alabama property induced them to renew or forbear from collection on the amounts already owed. The Kleppingers claim that as a result of Debtor's later transfer of the property, a valuable asset was removed from Debtor's estate resulting in their inability to realize upon any equity existing in the property.

Debtor's promise to realize his equity in the Alabama property in order to repay the Kleppinger loan is only fraudulent if Debtor had no intention, at the time he made the representation, of honoring his promise. This requires a subjective evaluation of Debtor's state of mind. Debtor's intent is determined by looking at the totality of the circumstances with exceptions to discharge strictly construed against the creditor.[57] The determination of "a debtor's intent not to perform cannot be established solely by proof of its nonperformance, nor does his failure to perform the

---

[55]   Tr.T.82:12-83:6. Debtor also testified that the joint venture was not profitable. Tr.T. 138:9-10 ("[T]here was a negative all the way to the end and then we became whole.").

[56] *In re Acosta*, 406 F.3d 367, 372 (5th Cir. 2005), *citing, Palmacci v. Umpierrez*, 121 F.3d 781, 788 (1st Cir. 1997).

[57] *In re Stinson,* 364 B.R. 269, 275 (Bankr. W.D. Ky. 2007), *citing*, *In re Rembert*, 141 F.3d 277, 280-81 (6th Cir. 1998).

agreement throw upon him the burden of showing that his nonperformance was due to reasons which operated after the agreement was entered into."[58]   Just because a debtor is not able to live up to a promise or fails to repay a debt, it does not mean that the debtor has necessarily made a false representation.[59]

Debtor promised that the equity in his Alabama property would be available to repay the Kleppinger loan.  Despite this assertion, Debtor avoided taking any steps to execute on his promise. The record is devoid of any evidence that Debtor attempted to market, mortgage, or otherwise liquidate his equity in order to pay the Kleppinger debt.  The record also reflects that Debtor made no voluntary payments on the debt from 2004-2005, nor did he use any other assets to reduce the Kleppinger debt.[60]  Instead, as the Kleppingers became more insistent on the sale of this property to repay their debt, Debtor transferred the Alabama property to his sister without receiving any consideration for its equity.  The circumstances surrounding the transfer indicate an intent to place it beyond creditors' grasp.[61]  As a result, the Court concludes that Debtor had no intention of

---

[58]  Restatement § 530; subsection 1, cmt. d.

[59] *In re Acosta*, 406 F.3d 367 (5th Cir. 2005), *In re Sutton*, 324 B.R. 624 (Bankr. W.D.Ky. 2005).

[60]  Debtor's account was reduced in July 2004 by the sale of the last joint venture property, Dauphine Street.  As was their custom, the profits realized on Dauphine were applied to Debtor's outstanding obligation to the Kleppingers.

[61]  Debtor transferred this and two other properties a few days before the execution of the Agreement "pledging" his assets to the repayment of the Kleppinger loans.  All were transferred to his sister for nothing more than the assumption of debt.  Debtor's conveyances to his sister raise a number of "red flags" and satisfy many of the factors considered to evidence intent to defraud.  *See, e.g., Matter of Chastant*, 873 F.2d 89, 91 (5th Cir. 1989)(listing six factors evidencing intent to defraud, often referred to "badges of fraud": (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention, possession benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the

16

satisfying the Kleppinger debt from the Alabama property and therefore his representations to the contrary in April of 2004 were fraudulent.

The Kleppingers also allege that their loan is non-dischargeable as a result of Debtor's actions in March of 2005. At that time, the Spain Street project was finished but had not sold. Kleppinger became increasing agitated over the amounts owed by Debtor. Kleppinger again confronted Debtor, this time insisting that he sign the Agreement acknowledging the debt and "pledging" his assets to its repayment. Kleppinger complains that as a result of this Agreement, he refrained from collection. He also avers that Debtor's pledge of his assets was a false statement or representation to induce his forbearance from collection since Debtor had already transferred virtually all of his property to his sister.

In March of 2005, Debtor "pledged his assets" to repay the Kleppinger debt. In 2005, Debtor made no specific representations as to the availability of any assets to satisfy this debt.[62] Unbeknownst to the Kleppingers, Debtor had previously transferred the Alabama, Jasmine, and Burgundy properties to his sister. Debtor's interest in these properties was unknown to the Kleppingers at the time the Agreement was signed. Based on Kleppinger's testimony, the Kleppingers relied entirely on the existence of Spain Street and the Alabama property to satisfy their debt. Thus the transfers of the Burgundy and Jasmine properties, while under questionable circumstances, cannot form the basis for a fraudulent representation under §523(A)(2) because the

_____

incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry). *See also, Kelly v. Armstrong*, 141 F.3d 799, 802 (8th Cir. 1998)(identifying five badges of fraud); *In re Sherman*, 67 F.3d 1348, 1354 (8th Cir. 1995)(listing 11 badges of fraud; *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1255 (1st Cir. 1991); and *In re Sissom*, 366 B.R. 677, 692-93 (Bankr. S.D.Tex. 2007)(listing 13 badges of fraud).

[62] Tr.T. 49:16-21.

17

Kleppingers did not rely on their existence.

The Kleppingers have also failed to establish that the representations in the Agreement induced them to extend credit or forbear from collection. By March of 2005, the amounts due to the Klepplingers were almost fully funded.[63] Therefore, the Agreement could not have been an inducement to extend additional credit. Additionally, although the Kleppingers claim to have refrained from execution on their debt as a result of the Agreement, the Court does not find this to be correct. Almost immediately after the execution of the Agreement, the Kleppingers continued to hound Debtor for payment. Kleppinger admitted to leaving angry phone messages and pounding Debtor's residence door within weeks of its execution.[64] About two months later, Kleppinger retained counsel and began the process of instituting civil and criminal complaints against Debtor. This evidence establishes that, in fact, the Kleppingers did not forbear from collection as a result of the Agreement.[65]

Having examined the allegations of the Kleppingers and the statements of Debtor, the Court concludes that only Debtor's representations in 2004 to the effect that the Alabama property would available to satisfy the Kleppinger loan satisfy the first four elements of proof. Only this representation was false, justifiably relied upon by the Kleppingers and made by Debtor in order to

---

[63] Several mortgage payments were made on the superior loans against Spain Street after March 2005, however, the Court finds that these were made in order to preserve the Kleppingers' investment in the property and not in reliance on the Agreement.

[64] Tr.T. 55:5-19.

[65] Tr.T. 55:16-56:12. The Court also notes that the fifth element to establish a claim under § 523(a)(2)(A) is also lacking. The Kleppingers have failed to establish that the Jasmine and Burgundy properties had any value over and above the mortgage debts that encumbered them. As a result, they have failed to establish that the transfer of these properties was a proximate cause for their loss.

induce the Kleppingers to forbear from collection.  Having crossed this threshold, the Court now

turns to the last element of the claim, that the Kleppingers sustained a loss as a proximate result of

their reliance.

Debtor's schedules and statement of financial affairs indicate that there are few, if any, assets

with which to satisfy claims.  Thus, it is unlikely that the Kleppingers can expect any dividend from

the liquidation of Debtor's estate.   However, in order for a debt to be excepted from discharge, the

loss to the creditor must be proximately caused by the false representation. "Only debts proximately

arising from the obtaining of property by fraud are nondischargeable under § 523(a)(2)(A)."[66] Unlike

claims under §§547,  548, or 727, the actions or omissions of a Debtor under §523 must be specific

to the creditor.  Thus the offending conduct must not only be false or fraudulent and relied upon by

the creditor, but also the proximate cause of his loss.  False or fraudulent conduct that generally

reduces the Debtor's estate or generally defrauds creditor interests will not satisfy the elements of

§523.

There are two criteria necessary to establish proximate causation; "causation in fact" and

"legal causation."[67]  "'Causation in fact' requires that a debtor's misrepresentations be a substantial

factor in the creditor's decision that ultimately results in the loss."[68]  As previously determined, the

Debtor's representation that the equity in the Alabama property  would be available to satisfy the

Kleppinger debt was a substantial or material factor in  the Kleppingers' decision to forbear from

---

[66] *In re Melcher*, 319 B.R. 761, 773 (Bankr. D.Dist.Col. 2004), *citing, United States v. Spicer*, 57 F.3d 1152, 1157 (D.C.Cir. 1995), *cert. denied*, 516 U.S. 1043, 116 S.Ct. 701, 133 L.Ed.2d 658 (1996).

[67] *In re Creta*, 271 B.R. 214, 219 (1st Cir.BAP 2002).

[68] *Id., quoting,* Restatement § 546.

collecting their debt.  But for the representation, the Kleppingers presumably would have seized the property, liquidated it through legal process and applied any funds received to their debt.  As a result, causation in fact exists.

Prior to *Mans* and *Acosta*, a direct correlation between the debt extended, the misrepresentation,  and the loss was not required.[69]  Dischargeability was an "all or nothing" proposition.[70]  In cases of actual fraud, proof of proximate loss to the creditor as a result of the fraud was required; although often held to only consist of "but for" causation.[71]

With the Supreme Court's directive to apply the common law as set forth in the Restatement, recent decisions have required a closer nexus between the loss sustained and the misrepresentation. This nexus is defined as legal causation.  Legal causation "requires that a creditor's loss reasonably be expected to result from the reliance."[72]  Only debts proximately arising from the obtaining of property by fraud are nondischargeable under §523(a)(2)(A).[73]

> It is not enough to show that false representations were made; [the plaintiff] must also show that her damage flowed directly form the misrepresentations.  *McCrory v. Spiegel*, 260 F.3d 27 (1st Cir. 2001).
>
>     *                              *                              *

---

[69] *See, In re Mercer,* 246 F.3d 391 (5th Cir. 2001); *Gerlach, supra; In re Bercier, supra;* and *In re Allison, supra.*

[70] *Birmingham Trust National Bank v Case*, 755 F.2d 1474, 1477 (11th Cir. 1985), *superseded by statute*, § 523(a)(2)(A), *as amended by,* the Bankruptcy Amendments and Federal Judgeship Act of 1984, *as recognized in, Muleshoe State Bank, Muleshoe, Tex. v. Black*, 77 B.R. 91, 92 n.1 (N.D.Tex. 1987).

[71] *RecoverEdge*, 44 F.3d at 1293 (5th Cir. 1995) *quoting In re Roeder*, 61 B.R. 179, 181 (Bankr. W.D.Ky. 1986).

[72] *In re Creta*, 271 B.R. at 219, *quoting,* Restatement §548A (internal punctuation omitted).

[73] *United State v Spicer*, 57 F.3d 1152, 1157 (D.C. Cir. 1995), *cert. denied*, 516 U.S. 1043. 116 St.Ct.701, 133 L.Ed.2d 658 (1996).

And in general, the causation element in fraud cases demands more than mere "but-for" causation. [citations omitted].  Restatement (Second) of Torts §548A (1977)(to establish fraud, fraudulent act must be a "substantial cause" of victim's loss).  *See also, Archer v Warner*, 538 U.S. 314, 325-26, 123 S.Ct. 1462, 155 L.Ed.2d 454 (2003)(Thomas, J., joined by Stevens, J., dissenting)(for §523(a)(2)(A) to apply, the creditor's loss must be proximately traceable to the fraudulent act, and superseding independent causes can sever any causal nexus even if there was some remote connection between the injury and the loss). ...Proximate cause requires both causation in fact (but-for causation) and legal causation.  *See, e.g. Shaw v. Santos*, 304 B.R. 639, 669-70 (Bankr. D.N.J. 2004).[74]

Legal cause exists only as to "those pecuniary losses that are within the foreseeable risk of harm that it [the misrepresentation] creates...This means that the matter misrepresented must be considered in the light of its tendency to cause those losses and the likelihood that they will follow."[75]

The transfer of the Alabama property resulted in a direct loss to the Kleppingers, but the loss is not equivalent to the entire debt owed by Debtor.  It is significant that the representations by Debtor in 2004 did not promise any available property from which future advances could be obtained.  As of April 2004, the outstanding indebtedness to the Kleppingers was $137,800. After April 2004, the Kleppingers invested an additional $50,135.56 to complete the renovations and service the debt on Spain Street.[76]  The Debtor represented $140,000 in available equity between Spain Street and the Alabama properties.  Given the balance already outstanding, losses attributable to the additional advances made after April 2004 could not have been proximately caused by the removal of the Alabama property from Debtor's estate.[77]

---

[74] *In re Melcher*, 319 B.R. 761, 773 (Bankr. D.Dist.Col. 2004).

[75]  Restatement §548A cmt. a and b.

[76]  Of the amounts lent, $27,300 paid the superior mortgage debt on the property.

[77]  The Court notes for the record that Kleppinger could not have justifiably relied upon Debtor's representations in making the later advances given the lack of equity in the properties.

21

It is also clear that the Kleppingers only relied on the Alabama property to satisfy $80,000

of the outstanding balance owed.   There was no indication or evidence presented that the

Kleppingers expected to receive anything other than $80,000 from this property.  Debtor did not

deny his representation that the property had a value of $80,000 over and above its debt.[78] The loss

suffered is the entire amount of the credit extended as a result of the misrepresentation.[79]  A direct

and proximate loss in the amount of $80,000 resulted from Debtor's representation that the equity

---

It is significant that in large measure, Kleppinger himself paid these advances directly to third
party contractors and those with priming liens against Spain Street.  The Court finds that the
advances made after April 2004, were to complete the Spain Street project and protect the
Kleppingers' previous investment in it rather than as a result of any representation made by
Debtor.  Thus, the Kleppingers did not rely on the representations in making future advances or
if they did, based on the facts of this case, that reliance was not reasonable or justifiable.

[78]  In April 1998 Debtor's sister purchased the Alabama property for $144,000.  The
purchase was funded with a cash down payment of $65,000 and a loan for $79,000.  On April 30,
1998, Debtor's sister transferred an undivided one half interest in the property to Debtor.  Then
on March 19, 2001, she transferred her remaining interest to him. Exh. 4.  Debtor testified that
after he obtained full title he refinanced the debt against the property, paid the mortgage, and all
expenses of upkeep. Tr.T. 173:5-8, 174:21-24.  On March 4, 2005, Debtor reconveyed the
property back to his sister for "ten dollars and other valuable consideration."  Exh. 4.  Debtor's
Statement of Financial Affairs states that the property was purchased by him for $150,000 and
was encumbered by a $138,000 mortgage at the time of reconveyance. Debtor's Statement of
Financial Affairs does not disclose the Alabama property's fair market value as required.

[79]  *See*, Restatement § 549 cmt. a.

22

in the Alabama property would be available to the Kleppingers.[80]   Therefore, $80,000 of the

Kleppingers' debt is non-dischargeable and the remaining $73,350.16 is dischargeable.

New Orleans, Louisiana, August 10, 2007.

Hon. Elizabeth W. Magner
U.S. Bankruptcy Judge

---

[80] This ruling is in accordance with *Cohen v. de la Cruz*, 523 U.S. 213, 218, 118 S.Ct. 1212, 1216, 140 L.Ed.2d 341 (1998), which held that "the share of money, property, etc., that is obtained by fraud gives rise to a nondischargeable debt."  Although the record indicates that there may have been as little as $12,000 in equity in the Alabama property, Kleppinger was led to believe that there was $80,000 in equity, and it was this figure upon which he relied when extending credit.  This Court uses that value because the Debtor fraudulently transferred the property to his sister, not because he improperly estimated the amount of equity in the Alabama property.  *See also*, Restatement § 549.